# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JERRY DAVIS,

                **Petitioner,**

      **v.**

GEORGE O. ROBINSON,

                **Respondent.**

**Civil Action No. 20-0552 (ES)**

**OPINION**

SALAS, DISTRICT JUDGE

Petitioner Jerry Davis is proceeding with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (D.E. No. 1, Petition ("Pet.")). Before the Court is Respondent George O. Robinson's motion to dismiss the petition as untimely. (D.E. No. 11 ("Mot.")). Having considered the Motion and Petitioner's response, (D.E. No. 13 ("Resp.")), the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons expressed below, the Court **GRANTS** Respondent's Motion, **DENIES** the Petition as untimely, and **DENIES** a certificate of appealability.

## I.     BACKGROUND

The New Jersey Superior Court, Appellate Division (the "Appellate Division") provided the following summary of facts and evidence presented at trial:[1]

> [Petitioner] has two daughters, Ava and Dawn.[2] In August 2005, Ava was eight years old and Dawn was five years old.

---

[1]      Pursuant to 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

[2]      The Superior Court used, and this Court uses, fictitious names for the children and their mothers to protect their identities.

Ava lived with her mother, Catherine, in a three bedroom apartment in Plainfield. Colleen Holloman and David Dix, who shared a bedroom, lived with them from June to mid-August of 2005. David's brother, Derrick Dix, lived there as well in the third bedroom. Catherine testified that after Ava turned five, [Petitioner] saw her approximately every two to three weeks. As of August 2005, Ava had not made any complaints about him and [Petitioner] had not requested to spend more time with Ava.

Dawn lived with her mother, Cora, and Cora's son, Kyle, in Linden. According to Catherine, Ava had a "beautiful" relationship with Dawn and Cora and a "good" relationship with [Petitioner]. Ava visited with Dawn and Cora, staying the weekend "about every other month or so." On these occasions, [Petitioner] brought Ava to Cora's apartment and returned her to her mother's home.

On Saturday, August 6, 2005, Cora returned home with the two girls and her son from a basketball game at approximately 9:30 p.m. She left the girls with [Petitioner] while she went to the supermarket with her son. When she returned at approximately 11:00 p.m., both girls had taken baths and were in bed. [Petitioner] took Ava home to her mother on Sunday at around dinnertime.

Catherine testified that Ava "seemed to be okay" when she returned. [Petitioner] called Catherine on Monday evening to see how Ava was doing, which Catherine said was something he did not usually do.

On Tuesday, August 9, Colleen was watching Ava while Catherine was at work as a bus driver. Colleen asked Ava about her weekend with her father. Ava said she did not like visiting her father and then asked, "Colleen, could I tell you something?" Colleen said "what." Ava then said she did not like to go to her father's house because "he put [his] fingers in her privacy." Colleen testified that Ava complained "she was sore down there in her private." Ava asked Colleen not to tell her mother. She told Colleen that when she was with her father, he had put her in the bathtub, and then took her out, dried her off and "started kissing her and putting his fingers in her vagina and asking her how it felt[.]" Colleen testified that Ava was upset and mad as she was telling Colleen this and said she did not like her father.

That night, Colleen told Catherine that [Petitioner] was molesting Ava. Catherine asked Ava what had happened. Ava told her that as

2

she and her sister were getting ready to take a bath, [Petitioner] called her into the room and told her to sit on his lap facing him. She said that [Petitioner] "grabbed her and starting feeling her butt," and put his middle finger inside her and squeezed her breasts. Ava later told Catherine that [Petitioner] kissed her. Catherine testified that Ava was frowning, looking uncomfortable, as she described the incident, and afterward, she started crying. She and Colleen hugged and kissed her. Catherine asked Ava why she had not told her about this when she came home. She replied that she was scared; "she thought [Catherine] was going to yell at her and [] wasn't going to believe her and [] was going to tell her dad." Catherine told Ava she would take care of it.

Neither Catherine nor Colleen contacted the police or took Ava to the hospital that night because they were concerned that if they did, the Division of Youth and Family Services would intervene and take Ava away. Catherine called the Plainfield police on Wednesday and eventually spoke to the Linden police on Thursday. She was referred to the prosecutor's office. Detective Walter Johnson took a videotaped statement from Ava, which was played for the jury. Ava was also examined by Gladibel Medina, M.D. Dr. Medina testified that Ava described where she had been touched, that there were no injuries, and that the lack of injuries was not unusual, whether or not the described abuse occurred.

At trial, Ava recounted the incident involving her father. She testified that she and Dawn prepared to take a bath. Dawn had taken her clothes off and went into the bath. Ava also took her clothes off but before she got into the bath, [Petitioner] told her "to stop real quick[.]" He went into the kitchen, took some pills, and then returned to her in Dawn's bedroom. [Petitioner] sat on the bed and told her to come to him and sit on his lap. Then he told her to turn around so she would be facing him. [Petitioner] asked her if she loved him. Ava said she did not reply. [Petitioner] "squeezed [her] butt" with his hand, which made her feel uncomfortable. Then he squeezed her chest with his hand, which she said made her feel "[d]isgusting." Ava testified that [Petitioner] then put his middle finger in her "private," which she said felt "[n]asty." Ava said that it hurt a little bit but she did not say anything because she was scared. Ava testified that, after that, [Petitioner] kissed her on the lips and put his tongue in her mouth. He asked her again if she loved him and again she did not reply. Ava said she felt disgusting. She got off his lap and took a bath. Ava testified that she did not say anything to [Petitioner] because she was "very scared" of

3

him.  [Petitioner] told her to keep it a secret or he would "whop" her. Ava said that [Petitioner] had never hit her or spanked her before.

[Petitioner] did not testify or present any witnesses.  His counsel argued that the allegations were fabricated in retaliation for [Petitioner's] complaints about Ava's living conditions and interest in pursuing joint custody.

*State v. J.R.D.*, No. A-3476-08T4, 2012 WL 5372113, at *1–2 (N.J. Super. Ct. App. Div. Nov. 2, 2012).

Following the trial, the jury found Petitioner guilty of first-degree aggravated sexual assault ("count one"), second-degree sexual assault ("count two"), and second-degree endangering the welfare of a child ("count three").  (*See* D.E. No. 11-5).  The trial court sentenced Petitioner to twenty years in prison on count one, a concurrent ten-year term on count two, and a consecutive five-year term on count three, all with an eighty-five percent period of parole ineligibility.  (*Id.*).  On August 12, 2008, the trial court entered its judgment of conviction.  (*Id.*).

Petitioner appealed his conviction and sentence.  On November 2, 2012, the Appellate Division affirmed.  *See J.R.D.*, 2012 WL 5372113, at *12.  On June 28, 2013, the New Jersey Supreme Court denied his petition for certification.  *See State v. J.R.D.*, 67 A.3d 1192 (N.J. 2013).

Petitioner proceeded to file an application for post-conviction relief ("PCR") on July 13, 2013.  (*See* D.E. No. 11-8).  The PCR trial court denied the application on April 29, 2016.  (*See* D.E. No. 11-10).  Thereafter, Petitioner filed a PCR appeal on July 5, 2016.  (*See* D.E. No. 11-11).  On April 5, 2018, the Appellate Division affirmed, *see State v. J.R.D.*, No. A-4649-15T2, 2018 WL 1630293 (N.J. Super. Ct. App. Div. Apr. 5, 2018), and the New Jersey Supreme Court denied Petitioner's petition for certification on October 23, 2018.  *See State v. J.R.D.*, 195 A.3d 530 (N.J. 2018).

On or about January 10, 2020, Petitioner filed his habeas Petition with this Court.  (*See* Pet.).  In response, on July 9, 2021, Respondent filed the instant motion to dismiss arguing that the

Petition is untimely under the one-year statute of limitations governing Section 2254 petitions. (*See* D.E. No. 11-1 ("Mov. Br.") at 3–7).

Petitioner did not respond initially to Respondent's motion to dismiss.  Rather, on March 1, 2022, the Court ordered Petitioner to show cause as to why it should not dismiss the Petition as untimely.  (D.E. No. 12 ("March 1, 2022 Order")).  Petitioner responded to the Order on March 24, 2022.  (*See* Resp.).  In his Response, Petitioner asserts three equitable reasons why he contends the Court should not dismiss the matter as untimely.  (*See id.*).

## II.    STANDARDS OF REVIEW

The governing statute of limitations under the Antiterrorism and Effective Death Penalty Act ("AEDPA") is found at 28 U.S.C. § 2244(d) and states in relevant part:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> . . .
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d); *see also Jones v. Morton*, 195 F.3d 153, 157 (3d Cir. 1999).[3]

---

[3]      In some cases, the limitation period runs not from the date on which the judgment becomes final, but from the latest of:

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

Evaluation of the timeliness of a petition pursuant to Section 2244(d)(1)(A) generally requires three determinations. *First*, a habeas court must determine when the pertinent judgment became "final." A judgment is final at the conclusion of direct review or the expiration of time for seeking such review, including the ninety-day period for filing a petition for writ of certiorari in the United States Supreme Court. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012).

*Second*, a habeas court must determine the period during which an application for state post-conviction relief was "properly filed" and "pending." A "properly filed" application is one that was accepted for filing by the appropriate court officer and was filed within the time limits prescribed by the relevant jurisdiction. *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005). In New Jersey, petitioners have five years from the date the trial court enters a judgment of conviction to file a PCR petition. *See* N.J. Ct. R. 3:22-12(a). A properly filed application is "pending" until it has achieved final resolution through the State's post-conviction proceedings, including the interval between a lower court's entry of judgment and the timely filing of a notice of appeal or petition for review in the next court. *Carey v. Saffold*, 536 U.S. 214, 220–21 (2002). However, if a petitioner does not seek certiorari regarding his PCR petition from the United States Supreme Court, the ninety-day period for which he could have done so does not count as "pending." *See Stokes v. Dist. Att'y of Cnty. of Phila.*, 247 F.3d 539, 542 (3d Cir. 2001). Moreover, in the case of an untimely notice of appeal that an appellate court nonetheless considers, an application is not pending between the expiration of the time to file that appeal and the untimely filing. *See Martin*

---

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*See* 28 U.S.C. § 2244(d)(1). These other scenarios are not relevant here, however, because Petitioner does not allege that (i) an impediment existed under state law which violated the Constitution or federal law and which prevented him from filing this action, (ii) his claims are based on a newly recognized right, or (iii) the factual predicate for his claims was only recently discovered. (*See* Pet.). Accordingly, only subsection (A) of Section 2244(d)(1) is applicable in this case.

*v. Adm'r N.J. State Prison*, 23 F.4th 261, 271–72 (3d Cir. 2022); *Bilal v. Attorney Gen. of the State of N.J.*, No. 15-1765, 2017 WL 1243143, at *2 (D.N.J. Feb. 10, 2017).

*Third*, a habeas court must determine whether the matter warrants equitable tolling.  In *Holland v. Florida*, the Supreme Court held that AEDPA's one-year limitations period is subject to equitable tolling in appropriate cases, on a case-by-case basis.  *Holland v. Florida*, 560 U.S. 631, 649–50 (2010); *Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013).  A litigant seeking equitable tolling bears the burden of establishing two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  *Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 89 (3d Cir. 2013).

The diligence required for equitable tolling is reasonable diligence, not maximum, extreme, or exceptional diligence.  *Holland*, 560 U.S. at 653.  "This obligation does not pertain solely to the filing of the federal habeas petition, rather it is an obligation that exists during the period appellant is exhausting state court remedies as well."  *LaCava v. Kyler*, 398 F.3d 271, 277 (3d Cir. 2005) (citation omitted); *see also Alicia v. Karestes*, 389 F. App'x 118, 122 (3d Cir. 2010) (holding that the "obligation to act diligently pertains to both the federal habeas claim and the period in which the petitioner exhausts state court remedies").  Reasonable diligence is examined under a subjective test, and it must be considered in light of the particular circumstances of the case.  *See Ross*, 712 F.3d at 799; *Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004) ("Due diligence does not require the maximum feasible diligence, but it does require diligence in the circumstances.") (internal quotation marks and citations omitted).

The court also must determine whether extraordinary circumstances exist to warrant equitable tolling.  "[G]arden variety claim[s] of excusable neglect" by a petitioner's attorney do

not generally present an extraordinary circumstance meriting equitable tolling.  *Holland*, 560 U.S. at 651 (citations omitted); *see also Merritt v. Blaine*, 326 F.3d 157, 168 (3d Cir. 2003).  Rather, equitable tolling can be triggered only when "the principles of equity would make the rigid application of a limitation period unfair, such as when a state prisoner faces extraordinary circumstances that prevent him from filing a timely habeas petition and the prisoner has exercised reasonable diligence in attempting to investigate and bring his claims."  *LaCava*, 398 F.3d at 275–276 (internal quotation marks and citation omitted); *see also Holland*, 560 U.S. at 648–49 (relying on *Pace*, 544 U.S. at 418); *Jenkins*, 705 F.3d at 89 (holding that equitable tolling should be applied sparingly, and only when the "principles of equity would make the rigid application of a limitation period unfair") (citations omitted).

Indeed, extraordinary circumstances have been found only where: (i) the respondent has actively misled the petitioner, (ii) the petitioner has in some extraordinary way been prevented from asserting his rights, (iii) the petitioner has timely asserted his rights mistakenly in the wrong forum, or (iv) the court itself has misled a party regarding the steps that the party needs to take to preserve a claim.  *See Brinson v. Vaughn*, 398 F.3d 225, 230 (3d Cir. 2005).  Nevertheless, it must be restated that, even where extraordinary circumstances do exist, "if the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing."  *Brown v. Shannon*, 322 F.3d 768, 773 (3d Cir. 2003) (quoting *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)).

## III.    DISCUSSION

As this Court noted in its March 1, 2022 Order, Petitioner's judgment became final on September 26, 2013 at the expiration of his time for seeking a petition for writ of certiorari in the United States Supreme Court on direct appeal.  (*See* March 1, 2022 Order ¶ 16).  The one-year AEDPA statute of limitations did not begin to run at that time, however, because Petitioner had properly filed his PCR petition on July 13, 2013.  (*See id.*).  Instead, the statute of limitations began to run after June 13, 2016, when the time for Petitioner to appeal the PCR trial court's April 29, 2016 denial of his petition expired.[4]  (*See id.*).  It continued to run for twenty-two days until Petitioner filed his untimely PCR appeal on July 5, 2016.[5]  (*See id.*).  Petitioner's pending post-conviction relief application continued to toll the statute of limitations until October 23, 2018, when the New Jersey Supreme Court denied his petition for certification.  (*See id.* ¶ 17).  Thereafter, the statute of limitations began to run again because Petitioner did not seek certiorari before the United States Supreme Court, *see Stokes*, 247 F.3d at 542, and it continued to run until it expired 343 days later on October 1, 2019.  (*See id.*).  As Petitioner did not file his habeas Petition until on or about January 10, 2020, his Petition is untimely by at least 101 days.  (*See id.*).  Accordingly, the statute of limitations bars the Petition unless equitable considerations apply.  (*See id.*).

---

[4]    Under New Jersey Court Rule 2:4-1(a), Petitioner had forty-five days, i.e., until June 13, 2016, to appeal the denial.

[5]    The Court assumes for the purpose of this Opinion that Petitioner's filing of his untimely PCR appeal that the Appellate Division nevertheless considered tolled the statute of limitations thereafter.  However, the Third Circuit has yet to clarify whether, in such circumstances, tolling would begin on the date of the untimely filing, on some later date, or even at all.  *See Martin*, 23 F.4th at 271 ("While it is true that a state court's acceptance of an untimely appeal breathes new life into the state PCR proceeding – and may *at that point* trigger § 2244(d)(2)'s tolling mechanism (a determination that we need not reach today) – it does not resuscitate the PCR petition for the period in which it was, for all practical purposes, defunct.").  The Court need not decide whether and when Petitioner's untimely filing of his PCR appeal tolled the statute of limitations because it is sufficient for the purpose of this Opinion that the statute of limitations ran and was not tolled between the expiration of the time to appeal the PCR trial court's decision and the untimely filing of Petitioner's appeal before the Appellate Division.  *See id.*

In his Response to the Court's March 1, 2022 Order, Petitioner raises three reasons why equitable considerations apply to save his claim. (Resp. 1–3). For the reasons set forth below, the Court finds that none of the arguments have merit.

*First*, Petitioner contends that he previously filed his habeas petition under a different docket, and he argues that the Court should not count the period between his filing of the petition in that matter and the filing of his petition in the instant case toward the limitations period. (*See id.* ¶ 1). To be sure, Petitioner did file a habeas petition under another docket on or around October 15, 2019. *See Davis v. Robinson*, No. 19-19038 (D.N.J. filed Oct. 15, 2019). There, the Court administratively terminated the matter because Petitioner did not use the proper form, and it directed Petitioner to notify the Court in writing if he wishes to reopen the matter. *See Davis v. Robinson*, No. 19-19038 (D.N.J. Oct. 25, 2019) (D.E. No. 2) (order administratively terminating the petition). However, even if the Court deemed the instant petition filed on October 15, 2019 or, applying the prisoner mailbox rule,[6] on October 10, 2019, the date Petitioner signed the original petition, the instant petition would still be untimely by at least nine days.[7]

*Second*, Petitioner contends that the Court should not dismiss his petition as untimely because he claims he is actually innocent. (*See* Resp. ¶ 3). "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

---

[6]    *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998) (holding that a *pro se* prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court); *see also Moody v. Conroy*, 762 F. App'x 71, 73 (3d Cir. 2019) (holding that, under the prisoner mailbox rule, in the absence of evidence to the contrary, courts may conclude that an inmate places a filing in the hands of prison authorities for mailing on the date that it is signed).

[7]    Petitioner also contends in his Response that, in the order administratively terminating the prior matter, the Court "said [his petition] would not be considered out of time or time barred." (*See* Resp. ¶ 1). The Court made no such representation. Rather, it indicated that "if the case is reopened, it is not subject to the statute of limitations time bar if it was originally filed timely" and that "the Clerk's service of the blank habeas petition form shall not be construed as this Court's finding that the original Petition is or is not timely . . . ." *See Davis v. Robinson*, No. 19-19038 (D.N.J. Oct. 25, 2019) (D.E. No. 2) (order administratively terminating the petition).

"[H]owever, [] tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

In support of his actual innocence assertion, Petitioner claims that the prosecutor threatened him against testifying at his trial. (*See* Resp. ¶ 3). Had he testified, he would have spoken about a conversation that he had with his daughter's mother regarding his daughter's living conditions. (*See id.*). Petitioner alleges that he complained to the mother of the smell of drugs in her home and fights between the mother's older daughter and her boyfriend in the presence of Petitioner's daughter. (*See id.*). According to Petitioner, the charges against him were fabricated in retaliation for his complaints about his daughter's living conditions. (*See id.*). Petitioner also claims there is new evidence of a restraining order against the mother's older daughter and of a prior conviction of the boyfriend for stabbing the older daughter. (*See id.*).

In addition, Petitioner argues that he would have testified regarding alleged "foul play" from an attorney that had initially indicated that she would represent Petitioner at his trial. (*See id.*). For example, Petitioner contends that, during a consultation with the attorney, she asked him if he took any pills. (*See id.*). When he responded that he took one pill in the morning for blood pressure, the consultation abruptly ended, and the attorney later told Petitioner that she could no longer represent him. (*See id.*). Petitioner claims that his daughter's testimony that he took some pills before assaulting her "could have only come from my visited consultation" with the attorney. (*See id.*).

The Court finds that Petitioner does not meet the threshold requirement for his actual innocence plea. As an initial matter, Petitioner fails to present any evidence to support his

assertions.  Moreover, Petitioner fails to demonstrate that no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt, particularly in light of his own daughter's testimony against him.  *See McQuiggin*, 569 U.S. at 386.

*Third*, Petitioner contends that the Court should not dismiss his petition as untimely because, according to him, all his attorneys failed to properly inform him of the limitations period.  (*See* Resp. ¶ 4).  However, Petitioner fails to present any evidence that his attorneys failed to properly inform him of the limitations period, and, even if he did, such an argument amounts to the sort of "garden variety claim[s] of excusable neglect" by his attorneys that does not warrant equitable tolling.  *Holland*, 560 U.S. at 651 (citations omitted).  Accordingly, the Court finds that the matter does not warrant equitable tolling, and the statute of limitations bars the Petition.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  For the reasons expressed above, Petitioner's claims are all without merit and jurists of reason would not disagree with this Court's denial of Petitioner's habeas petition.  Accordingly, the Court denies Petitioner a certificate of appealability.

## V.   CONCLUSION

For the reasons stated above, Respondent's motion to dismiss is **GRANTED**, Petitioner's petition for a writ of habeas corpus is **DENIED**, and Petitioner is **DENIED** a certificate of

appealability.  An appropriate order follows.


Dated: May 3, 2023                                    *s/ Esther Salas*
                                                      **Esther Salas, U.S.D.J.**